Shayne C. Stevenson (*pro hac vice*)
Breanna Van Engelen (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
shaynes@hbsslaw.com
breannav@hbsslaw.com

Ben M. Harrington (SBN 313877)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
benh@hbsslaw.com

[Additional counsel on signature page]

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| AUSTIN MILLIKEN,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br><br>Defendant. | Case No. 3:23-cv-03709<br><br>Hon. Araceli Martinez-Olguin<br><br>**OPPOSITION TO DEFENDANT BANK OF AMERICA N.A.'S MOTION TO DISMISS**<br><br>Hearing:<br><br>Date: February 22, 2024<br>Time: 2:00 p.m.<br>Courtroom: 10 |

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 3

A. The CARD Act added substantive requirements to the Truth in Lending Act that protect Plaintiff and other cardholders from deceptive and predatory practices. ..... 3

B. Congress created only four narrowly drawn exceptions to the CARD Act's advance notice and protected balance requirements. ..... 5

C. Bank of America uses a proprietary method for raising interest rates on Plaintiff and millions of other Bank of America cardholders—increasing interest rates on card balances both retroactively and without notice. ..... 6

III. ARGUMENT ..... 7

A. Bank of America's motion faces a high burden. ..... 8

B. Bank of America's eleven retroactive interest rate increases since March 2022 on Plaintiff and millions of other cardholders are prohibited by the CARD Act. ..... 9

1. Bank of America's interest rate hikes were not imposed "according to operation of an index" beyond its control. ..... 10

2. Bank of America's proprietary formula retroactively games the Prime Rate index and therefore does not qualify for the variable rate exemption. ..... 12

3. Bank of America's proprietary interest rate formula is based upon billing cycles of its choosing and on that ground also fails to qualify for the variable rate exception. ..... 14

4. Increasing cardholders' interest rates *before* the index increases also disqualifies Bank of America's program from the variable interest rate exception. ..... 15

5. Bank of America's arguments in support of qualifying for the CARD Act's narrow exception are unpersuasive. ..... 18

C. Bank of America's disclosure of its proprietary, retroactive interest rate hike formula is irrelevant—the practice is unlawful. ..... 21

D. Bank of America's unlawful interest rate practices also violate the California Unfair Competition Law. ....................21

IV. CONCLUSION ....................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.H. v. West Contra Costa Unified School Dist.*,
2023 WL 6390621 (N.D. Cal. Sept. 28, 2023) .......... 8

*Am. Home Prod. Corp. v. Liberty Mut. Ins. Co.*,
748 F.2d 760 (2d Cir. 1984) .......... 15

*Barton v. Barr*,
140 S. Ct. 1442 (2020) .......... 9

*Bekaert Corp. v. Standard Sec. Life Ins. Co.*,
2011 WL 3568028 (N.D. Ohio Aug. 15, 2011) .......... 10, 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 8

*Bello v. Capital One Bank (USA), N.A.*,
2020 WL 728804 (D.N.J. Feb. 13, 2020) .......... 8, 19

*Billhofer v. Flamel Techs., SA*,
663 F. Supp. 2d 288 (S.D.N.Y. 2009) .......... 15

*Cappuccio v. Prime Capital Funding L.L.C.*,
649 F.3d 180 (3d Cir. 2011) .......... 3

*City of Pataskala v. Fraternal Order of Police*,
2000 WL 192583 (Ohio Ct. App. Sept. 28, 1999) .......... 11

*Davel Commc'ns, Inc. v. Qwest Corp.*,
460 F.3d 1075 (9th Cir. 2006) .......... 8

*Demry v. Citibank (S. Dakota), N.A.*,
2003 WL 179772 (S.D.N.Y. Jan. 24, 2003) .......... 21

*Lowman v. Citibank (S. Dakota), N.A.*,
2007 WL 5674022 (C.D. Cal. Sept. 19, 2007) .......... 19

*Moore v. Wells Fargo Bank, N.A.*,
2023 WL 5538268 (N.D. Cal. Aug. 28, 2023) .......... 8

*Padilla v. City of Richmond*,
509 F. Supp. 3d 1168 (N.D. Cal. 2020) .......... 15

*In re Pettit Oil Co.*,
917 F.3d 1130 (9th Cir. 2019) .......... 13

*Pioneer Nat'l Title Ins. Co. v. Child, Inc.*,
401 A.2d 68 (Del. 1979) .......... 12

*Royce v. Michael R. Needle, P.C.*,
2015 WL 5095721 (N.D. Ill. Aug. 20, 2015) .......... 10, 11

*Search v. Bank of America, N.A.*,
2012 WL 4514285 (W.D. Wash. Oct. 2, 2012) .......... 19

**Statutes**

15 U.S.C. §§ 1601-1666j .......... 3

15 U.S.C. § 1637(i)(1) .......... 4, 9

15 U.S.C. § 1666i-1 .......... *passim*

Credit Card Accountability Responsibility and Disclosure Act of 2009, Pub. L. No. 111-24, 123 Stat. 1734 (2009) .......... 1

**Other Authorities**

12 C.F.R. § 1026 *et seq*. .......... 3

12 C.F.R. § 1026.14(d) .......... 7

12 C.F.R. § 1026.55(b) .......... 2, 15

155 Cong. Rec. S5313 (daily ed. May 11, 2009) .......... 4

74 Fed. Reg. 5498, 5521 (Jan. 29, 2009) .......... 4, 9

75 Fed. Reg. 7658, 7737 (Feb. 22, 2010) .......... 12, 13, 14

Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation from the Inside—An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I*, 65 Stan. L. Rev. 901, 934 (2013) .......... 9

S. Rep. No. 111-16 (2009) .......... 5, 9

## I. INTRODUCTION

Before the enactment of the Credit Card Accountability Responsibility and Disclosure Act of 2009 ("CARD Act"),[1] credit card interest rate increases were virtually unregulated. ¶¶ 20-23.[2] Credit card issuers could raise interest rates at any time without justification or advanced notice and impose these increased rates on consumers' total balance—including previous purchases. *Id*. After Congressional hearings and extensive fact-finding, the federal financial agencies found that these were "unfair practices" that caused substantial unavoidable injury to consumers. Following these agencies' lead, Congress expressly banned these practices—subject to specific *narrowly drawn* exceptions—in the CARD Act. ¶¶ 24, 27. But because of the current environment of ever-increasing interest rates, some of the CARD Act's protections are becoming important for the first time, and institutions like Bank of America are testing the CARD Act to see what they can get away with. ¶¶ 33-34.

Seizing on the unprecedented rise in the U.S. Prime Rate, Bank of America ignored the CARD Act's consumer protections and illegally hiked interest rates on millions of accounts over the past year and a half. *Id*. It did not give any advanced notice of these rate increases and imposed the rate hikes on outstanding balances. ¶ 38. These are the exact "abusive" and "unfair" practices that the federal financial agencies and then Congress sought to eliminate. ¶ 39.

Bank of America tries to justify its conduct under a single, narrow exception to the CARD Act's advanced notice and protected balance requirements. But, as explained below, the Act's "variable rate" exception doesn't apply. It is not enough that Bank of America's pretext for raising rates mentions the Wall Street Journal's Prime Rate. ¶¶ 11, 37-41. The Bank utilizes a proprietary formula to backdate its own rate increases to inflate finance charges, disqualifying it from the variable rate exception. ¶¶ 41, 44.

---

[1] Pub. L. No. 111-24, 123 Stat. 1734 (2009). Rule-making power and regulation under TILA (and the CARD Act amendments to same) was transferred from the Federal Reserve Board to the Consumer Financial Protection Bureau upon passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.

[2] In this pleading, "¶" refers to Plaintiff's Class Action Complaint, Dkt. 1 (July 26, 2023).

Thus, Bank of America uses its own proprietary variable rate formula to increase daily interest before the Prime Rate increase even takes effect. *Id*. Specifically, Bank of America applies rate increases on the first day of the billing cycle, rather than on the effective date of the Prime Rate increase which can be days or weeks later. Regulation Z, which implements the CARD Act, confirms the common-sense principle that a "card issuer cannot calculate interest charges based on that increased rate for days prior to the effective date."[3]

Contrary to Bank of America's argument, the problem is not just that the rate hikes are retroactive in that they apply to existing balances that were incurred at a lower rate. Bank of America goes a step further by backdating the effective date of its increase days or weeks before the effective date of the Prime Rate increase. ¶¶ 39-40. This retroactivity or backdating makes Bank of America ineligible for the CARD Act's variable rate exception. ¶ 41.

Importantly, by imposing a rate increase retroactively to the start of the billing cycle, Bank of America exercises a level of control that disqualifies the bank from the variable rate exception. ¶¶ 40-41. Under both its credit card agreements and federal law, Bank of America exercises unfettered discretion over the billing cycle, allowing it to decide when its new higher interest rates take effect for any given customer. Thus, for example, when the Prime Rate increased on July 28, 2022, not only did the bank retroactively hike virtually every customer's rate, but it also controlled the extent of the illegal finance charges.[4] The Bank's billing cycle decisions determined precisely when the rate took effect for each customer and the resulting finance charges imposed (*i.e.*, the number of days in which the higher daily periodic rate was imposed before its effective date).

Under Bank of America's construction of the law, the variable rate exception permits it to raise daily interest rates retroactive *at its discretion* even up to *three months before* any Prime Rate increase (since it can set billing cycles to last as long as 90 days) or make the rate increase retroactive to multiple billing periods.

---

[3] 12 C.F.R. § 1026.55(b).

[4] *See, e.g.*, JPMorgan Chase & Co., *Historical Prime Rate*, https://www.jpmorganchase.com/about/our-business/historical-prime-rate (providing dates of each Prime Rate change) (last visited Nov. 21, 2023). ¶ 33.

Bank of America's practice does not follow the plain language of the CARD Act or its regulations. ¶¶ 44-46. The practice of increasing rates on cardholders before an actual index rate increases and based on the bank's own proprietary billing cycle formula for raising rates does not meet the temporal or control criteria of the narrow variable rate exception to the CARD Act. ¶ 40. Bank of America may still raise rates, but it must give notice and apply the increased rates only to new balances as the CARD Act requires. ¶ 38.

For reasons argued below, Bank of America fails to carry its burden to show that a CARD Act exception applies to its novel, proprietary method of retroactively increasing interest rates on Plaintiff and millions of other cardholders. In particular, at the pleading stage, Bank of America's motion to dismiss should be denied.

## II. BACKGROUND

### A. The CARD Act added substantive requirements to the Truth in Lending Act that protect Plaintiff and other cardholders from deceptive and predatory practices.

For more than half a century, the Truth in Lending Act has, among other things, protected cardholders from various deceptive practices engaged in by lenders.[5] The initial focus of TILA aimed at transparency.[6] Credit card companies in particular were subject to a set of specific disclosure requirements meant to empower consumers to make intelligent choices about securing credit from competing lenders.[7]

Bank of America and other card issuers, however, could still raise credit card interest rates at their discretion. ¶¶ 20-24. One of their most abusive tactics was to raise interest rates without explanation or advanced notice and to impose those higher rates on outstanding balances. Consumers had made their purchasing decisions and then endured higher than anticipated borrowing costs on those past purchases.

---

[5] 15 U.S.C. §§ 1601-1666j.

[6] *See, e.g.*, *Cappuccio v. Prime Capital Funding L.L.C.*, 649 F.3d 180, 188 (3d Cir. 2011) ("Congress enacted TILA to guard against the danger of unscrupulous lenders taking advantage of consumers through fraudulent or otherwise confusing practices." (citation omitted)).

[7] *See* Regulation Z, 12 C.F.R. § 1026 *et seq*.

These abusive interest rate practices led federal financial agencies, including the Board of the Federal Reserve (collectively "Agencies"), to exercise their rulemaking authority to prohibit unfair or deceptive practices. The "Agencies conclude[d] that, except in certain limited circumstances, increasing the annual percentage rate applicable to an outstanding balance on a consumer credit card account is an unfair practice under [the Federal Trade Act]."[8] Based on Congressional hearings and extensive consumer surveys and investigation, the Agencies determined that the then-widespread practice of raising interest rates on outstanding balances caused "substantial consumer injury" that consumers could not reasonably avoid.[9]

Before the ink was dry on these regulations, Congress codified virtually the same rules into TILA through passage of the CARD Act. The CARD Act includes a specific requirement that credit card issuers provide forty-five-days' notice before any increase in the annual percentage interest rate can be imposed on cardholders.[10] ¶ 25. The CARD Act also explicitly prohibits increases in the annual percentage interest rate for any outstanding (or "protected") cardholder balance.[11] ¶ 50. In other words, interest rate increases after proper notice are permitted for new credit card transactions but the increase cannot be applied retroactively to existing "protected" balances already subject to lesser interest rates.[12]

In enacting the CARD Act, members of Congress denounced the practice of applying interest rate hikes to existing balances and without notice as an "abusive practice" and a form of "gouging."[13] According to the Senate Report:

> The ''Credit Card Accountability Responsibility and Disclosure Act of 2009'' was developed to implement needed reforms and help

---

[8] Unfair or Deceptive Acts or Practices, 74 Fed. Reg. 5498, 5521 (Jan. 29, 2009).

[9] *Id.* at 5522. Studies indicated that consumers paid billions of dollars of additional interest due to this practice. It was noted that often consumers could not transfer their existing balances to another card and, even if they could, costs were associated with the transfer. *Id.* at 5521-5522.

[10] 15 U.S.C. § 1637(i)(1).

[11] 15 U.S.C. § 1666i-1(a).

[12] 15 U.S.C. § 1666i-1(a).

[13] 155 Cong. Rec. S5313, S5314 (daily ed. May 11, 2009) (statement of Sen. Levin).

> *protect consumers by prohibiting various unfair, misleading and deceptive practices in the credit card market.*
>
> The bill contains numerous provisions which provide protection to consumers from unreasonable interest rate increases. The bill prohibits retroactive rate increases on existing balances, and requires creditors to provide a written notice of any rate increase at least 45 days before the increase takes effect.[14]

As argued below, Bank of America violates these two foundational protections of the CARD Act—the forty-five-day notice requirement and the sheltering of "protected balances" from retroactive rate hikes—through its own proprietary method of increasing interest rates on its cardholders. ¶¶ 45, 61-62.

**B. Congress created only four narrowly drawn exceptions to the CARD Act's advance notice and protected balance requirements.**

The CARD Act enacted a blanket prohibition on what the Agencies and Congress found to be an unfair and injurious practice: "In the case of any credit card account under an open end consumer credit plan, no creditor may increase any annual percentage rate, fee, or finance charge applicable to any outstanding balance, except as permitted under subsection (b)."[15] ¶ 60.

Subsection (b) contains four narrowly drawn exceptions to this general rule, including the variable rate exception at issue here. *See* ¶¶ 30-33. The CARD Act's variable rate exception states:

> (b) The prohibition [on increasing interest on outstanding balances] under subsection (a) shall not apply to—
> . . .
> (2) an increase in a variable annual percentage rate in accordance with a credit card agreement that provides for changes in the rate *according to operation of an index that is not under the control of the creditor* and is available to the general public.[16]

As discussed below, the Board confirmed that this language does not merely require a bank to rely upon the "operation of" an independent index in setting rates; it also prohibits banks from using their own formulae that manipulate the index rate change to the detriment of consumers. Such a

---

[14] S. Rep. No. 111-16, at 2 (2009) (emphasis added).

[15] 15 U.S.C. § 1666i-1(a).

[16] 15 U.S.C. § 1666i-1(b) (emphasis added).

formula, despite its relationship to an independent index, "controls the operation of the index" and disqualifies the creditor from relying on the variable rate exception. ¶ 40.

**C. Bank of America uses a proprietary method for raising interest rates on Plaintiff and millions of other Bank of America cardholders—increasing interest rates on card balances both retroactively and without notice.**

Bank of America instituted a proprietary method to increase its profit once the nation's historic low interest rates ended.[17] ¶¶ 40-41. The result has been hundreds of millions of dollars of excessive interest charged to millions of cardholders. ¶¶ 52, 62-64.

At its core, a variable interest rate is a composite of the index rate (here, the Wall Street Journal's U.S. Prime Rate) and a margin.[18] Though Bank of America's interest rate increases acknowledge the Prime Rate increases, the bank uses a proprietary variable rate formula that disadvantages consumers by (1) retroactively implementing interest rate hikes, and (2) allowing the bank to exercise control over how the Prime Rate index operates to determine a customer's finance charges and APR. ¶¶ 39-40.

Bank of America's credit card agreement states the following variable rate formula:

> An increase or decrease in the index will cause a corresponding increase or decrease in your variable rates *on the first day of your billing cycle that begins in the same month in which the index is published*.[19]

Once the Federal Reserve began raising interest rates in 2022—at an unprecedented pace—the Bank's proprietary formula went into practice and in violation of the CARD Act in four ways:

First, Bank of America controls *when* rate increases are imposed on customers. The Bank hikes rates on the first day of the billing cycle. ¶ 40. Under the credit card agreement and federal law,

---

[17] Notice of Mot. & Mot. of Def. Bank of America to Dismiss Comp.: Mem. P. & A. in Supp. Thereof ("Def. Memo.") at 4, Dkt. 19 (Sept. 22, 2023) (quoting its cardholder agreement).

[18] Def. Memo. at 2. Plaintiff does not here challenge Bank of America's use of the U.S. Prime Rate as a qualified index nor its ability to set its own proprietary "fixed-rate" interest for inclusion in the composite rate. What *is* unlawful about Bank of America's practice is the imposition of a proprietary *method* for retroactively imposing increased interest rates without notice, a practice not permitted by the CARD Act.

[19] Def. Memo., Ex. A at 2, Dkt. 19-1 (sample Bank of America variable-rate credit card agreement "as of June 30, 2023") (emphasis added); *see also* ¶ 40.

Bank of America has full control over the billing cycle, and thus controls when the rate increases take effect. The Bank not only controls when the billing cycle starts, but also sets the length of the billing cycle up to 90 days. It does this without statutorily required notice to cardholders and on protected balances.

Second, Bank of America increases customers' interest rates *before* the Prime Rate increases. ¶ 39. Under the Bank's credit card agreement, "interest accrues daily and compounds daily on new transactions, and balances remaining from previous billing cycles" based on a "daily periodic rate."[20] This means that whenever a customer's billing cycle *predates* the Prime Rate hike in a given month, Bank of America prematurely uses the *future index rate* to impose (and compound) daily interest charges. And again, without the required notice to cardholders.

Third, Bank of America controls the total amount of finance charges and APR[21] on customers' accounts. By controlling when a customer's rates will be increased—*i.e.*, the degree of retroactive imposition of an increased interest rate—the Bank controls the customer's ultimate interest charges. For example, by setting a customer's billing cycle to start on the 1st rather than 15th or 25th, the Bank increases the number of days on which daily interest charges are imposed at the higher (not yet effective) rate, increasing the finance charges and APR on the account.

## III. ARGUMENT

The CARD Act prohibits credit card companies from increasing interest rates on credit card balances without a written forty-five-day notice to cardholders, and it prohibits them from "increas[ing] any annual percentage rate" applicable to "any outstanding balance."[22] A limited exception to these general prohibitions exists for qualified issuers of variable interest rate credit cards who increase interest rates "according to operation of an index that is not under the control of the creditor and available to the public."[23]

---

[20] Def. Memo., Ex. A, Dkt. 19-1.

[21] 12 C.F.R. § 1026.14(d) (stating that when a daily periodic rate is used, APR may be calculated based upon the actual finance charges imposed).

[22] 15 U.S.C. § 1666i-1(a).

[23] 15 U.S.C. § 1666i-1(b)(2) (emphasis added).

Bank of America's proprietary, retroactive imposition of increased interest rates back to the beginning of a billing period—increased rates imposed on protected balances already subject to a lower interest rate—is not imposition of a higher interest rate "*according to* operation of an index" but instead *according to* a method invented and imposed by Bank of America.

**A. Bank of America's motion faces a high burden.**

It is well established that "federal courts may not dismiss a complaint unless it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."[24] On a motion to dismiss, the complaint survives challenge if it contains sufficient allegations such that, accepted as true, they "state a claim to relief that is plausible on its face."[25] Plaintiff's claims are "facially plausible" when facts are pled that "'allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"[26] As the Court has observed, "[i]n deciding whether a claim upon which relief can be granted has been pleaded, the court accepts all factual allegations as true and draws all reasonable inferences in favor of the plaintiff."[27]

The burden is on Bank of America to establish that one of the CARD Act's narrow exceptions allows it to raise customers' interest rates retroactively and without notice: "it is not Plaintiff's responsibility to foreclose them; rather, it will be up to [Defendant] to establish that one of these exceptions applies."[28]

"Exceptions to [TILA's] broad statutory language must be narrowly construed, not broadly construed, in order to avoid undermining the operation of the general principle. Moreover, the Truth

---

[24] *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1088 (9th Cir. 2006) (internal quotation marks omitted) (citation omitted).

[25] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[26] *Moore v. Wells Fargo Bank, N.A.*, 2023 WL 5538268, at *4 (N.D. Cal. Aug. 28, 2023) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[27] *A.H. v. West Contra Costa Unified School Dist.*, 2023 WL 6390621, at *2 (N.D. Cal. Sept. 28, 2023).

[28] *Bello v. Capital One Bank (USA), N.A.*, 2020 WL 728804, at *4 (D.N.J. Feb. 13, 2020).

in Lending Act is a remedial statute and should be construed in favor of the consumer."[29] This narrow reading is particularly important here because federal financial agencies and Congress found the practice of raising interest rates on outstanding balances and without advance notice to be among "unfair, misleading, and deceptive practices" that causes significant, unavoidable injury to consumers.[30]

The narrow reading of the variable rate exception is also required by the statutory and regulatory language, which is riddled with limitations on the exception's applicability, including "according to," "operation of," "due to," and "not under the control." Congress and the regulatory agencies' use of multiple limitations reflects an effort to be "doubly sure" that the exception would be construed narrowly.[31]

**B. Bank of America's eleven retroactive interest rate increases since March 2022 on Plaintiff and millions of other cardholders are prohibited by the CARD Act.**

Bank of America does not dispute that if the variable rate exception does not apply, its retroactive rate increases since March 2022 violate the CARD Act. This is both because Bank of America increased the rate not just on new transactions, but also on cardholders' outstanding (or "protected") balances,[32] and because the Bank did not comply with the forty-five-day notice requirement.[33] Bank of America agrees, acknowledging that regardless of any disclosure, the CARD

---

[29] *Daenzer v. Wayland* Ford, *Inc.*, 193 F. Supp. 2d 1030, 1036 (W.D. Mich. 2002) (citation omitted).

[30] 74 Fed. Reg. 5498, 5521 (Jan. 29, 2009); S. Rep. No. 111-16, at 2 (2009).

[31] *See Barton v. Barr*, 140 S. Ct. 1442, 1453, (2020) ("[R]edundancies are common in statutory drafting—sometimes in a congressional effort to be doubly sure . . . ." (citation omitted)); Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation from the Inside—An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I*, 65 Stan. L. Rev. 901, 934 (2013) (legislative drafters "intentionally err on the side of redundancy . . . 'because you just want to be sure you hit it'" (citation omitted)).

[32] 15 U.S.C. § 1666i-1(a).

[33] 15 U.S.C. § 1637(i)(1).

Act generally prohibits it from raising interest rates (a) on its cardholders' protected balances and (b) without the required forty-five-day notice.[34]

Bank of America argues, however, that an exception to the CARD Act requirements for variable interest rate credit cards protects its conduct, allowing it to raise interest rates retroactively and without any advance notice of the change to Plaintiffs and millions of other cardholders.[35] Bank of America cannot meet its burden of showing the exception applies.

**1. Bank of America's interest rate hikes were not imposed "according to operation of an index" beyond its control.**

Bank of America centers its argument on this: the U.S. Prime Rate increased ten (now eleven) times since March 2022 and the Bank raised its interest rates on Plaintiff and other cardholders the same number of times, therefore the Bank qualifies for a narrow CARD Act exception to its robust consumer protections.[36] But this logic doesn't satisfy the language of the exception; Bank of America uses Prime Rate changes as a pretext for retroactive rate increases.

The language of the variable rate exception requires that Bank of America raise interest rates only "according to the operation of an index" that is "not under [its] control."[37] The plain meaning of the critical terms of the variable rate exception ("*according to the operation of* an index") suffice to establish that Bank of America's proprietary, retroactive rate increase formula—a formula plainly "under [its] control" in development and implementation—does not qualify for it.

---

[34] Def. Memo. at 3; *see also* Consumer Fin. Prot. Bureau ("CFPB"), Comment for 12 C.F.R. § 1026.55(a), available at https://www.consumerfinance.gov/rules-policy/regulations/1026/interp-55/.

[35] Def. Memo. at 3 ("[T]he Bank's alleged actions are permissible under the variable-rate exception to the statutory and regulatory requirements.").

[36] Def. Memo. at 5 ("Plaintiff . . . acknowledges that there have been ten increases in the Prime Rate since March 2022—the same period over which plaintiff alleges the Bank increased its variable rates ten times."). That observation intentionally avoids the fact that the Bank's increases—by mere virtue of sharing an equal number—were not "according to" changes in the Prime Rate.

[37] 15 U.S.C. § 1666i-1(b)(2).

The phrase "according to" in the exception means the changes are "as stated by or formulated by" the index.[38] "According to" is narrower and more exacting than the phrase "in conformity with."[39] Courts repeatedly hold that "according to" and "in accordance with" denote strict adherence to the referenced standard, and reliance *only* upon the referenced standard.[40] For example *Bekaert Corp.*, the court held that, while the decision to extend insurance coverage did not violate COBRA, it still was not made "according to COBRA regulations" because it was not "dependent on the time periods" of COBRA.[41] The court held "the phrase 'according to COBRA regulations' reasonably means that continuation benefits must be offered only in reference to (*i.e.*, in conformity with or depending on) the COBRA regulations. In other words, the COBRA regulations must be the *only source* from which the coverage determination is made."[42]

Here, too, Bank of America's interest rate does not vary "according to operation of an index" because it operates retroactively and varies on the Bank's own time schedule, depending on billing cycles that it sets according to its sole discretion, not the "operation of an index." "According to operation of an index" means "only in reference to" the index, not in reference to the index combined with additional variables of the Bank's choosing.[43]

---

[38] Oxford English Dictionary, *according to*, https://www.oed.com/search/dictionary/?scope=Entries&q=according+to (last visited Nov. 21, 2023); *Bekaert Corp. v. Standard Sec. Life Ins. Co.*, 2011 WL 3568028, at *10 (N.D. Ohio Aug. 15, 2011) ("The phrase 'according to' means 'in conformity with,' 'as stated or attested by,' or 'depending on.') (citing *City of Pataskala v. Fraternal Order of Police*, 2000 WL 192583, at *3 (Ohio Ct. App. Sept. 28, 1999)(citing Merriam Webster's Collegiate Dictionary (10th ed. 1994))).

[39] *Royce v. Michael R. Needle, P.C.*, 2015 WL 5095721, at *5 (N.D. Ill. Aug. 20, 2015).

[40] *See, e.g.*, *Bekaert Corp.*, 2011 WL 3568028, at *10; *cf. Royce*, 2015 WL 5095721, at *5 ( recognizing, in dicta, that "according to" is more narrow than "a broader meaning such as 'in conformity therewith.'").

[41] *Bekaert Corp.*, 2011 WL 3568028, at *10 (holding "an act that does not clearly violate a statute is not necessarily 'according to' it").

[42] *Id.* (emphasis added). *Accord City of Pataskala*, 2000 WL 192583, at *1 (holding that the phrase "according to the most recent federal decennial census" means that the census is the only determinative source).

[43] *Bekaert Corp.*, 2011 WL 3568028 at *10.

Even if the Court construed "according to" to merely mean "consistent with," Bank of America's practices would still fail. Bank of America has repeatedly applied interest rate hikes days or weeks before the Prime Rate index increased (based upon the billing cycles it sets). Raising consumers' interest at a time when the index has *not* increased is not "consistent" in any sense with the "operation of" the index.

Congress's use of the phrase "operation of an index" reinforces this interpretation because "operation of" acts to exclude other, independent causes beyond the index. For example, interpreting the phrase "by operation of law," Delaware's high court explained: "the 'operation' or impact of the law upon the particular transaction, without more, is to be contrasted with events caused by the voluntary action of the parties. In the latter case, the result is not caused by operation of law."[44] The same is true here for the phrase "according to operation of an index that is not under the control of the creditor," *i.e.*, if the rate changes according to the bank's discretionary billing cycle rather than according to the index's effective dates, the "result is not caused by operation of [the index]."[45]

**2. Bank of America's proprietary formula retroactively games the Prime Rate index and therefore does not qualify for the variable rate exemption.**

Upon passage of the CARD Act, the Federal Reserve Board emphasized that the statutory standard "according to the operation of an index that is not under the control of the creditor"[46] does not merely require a variable rate formula related to an independent index. It also prohibits the creditor from manipulating the application of the index for its own profit (*i.e.*, controlling operation of the index in the bank's formula).[47] Thus, the Board has repeatedly stated that if the creditor "exercises control over the operation of the index," the variable rate exemption becomes inapplicable.[48]

---

[44] *Pioneer Nat'l Title Ins. Co. v. Child, Inc.*, 401 A.2d 68, 71 (Del. 1979) (citing *Emporium Capwell Co. v. Anglim*, 48 F. Supp. 292, 294 (N.D. Cal. 1943)).

[45] *Id.*

[46] 15 U.S.C. § 1666i-1(b)(2).

[47] Truth in Lending, 75 Fed. Reg. 7658, 7737 (Feb. 22, 2010).

[48] *Id.*

This interpretation is required by the plain language of the CARD Act. Indeed, the Act's words "the operation of" have no other purpose than to prevent manipulation of the index within the variable rate formula. If the mere relationship to an independent index were enough, the statute could have simply read: "according to ~~the operation of~~ an index that is not under the control of the creditor." The Court must adopt an interpretation that gives meaning to all terms.[49]

The Board provided several examples of variable rate formulae that rely upon an independent index but nonetheless do not qualify for the variable rate exception. For example, "a card issuer exercises control over the operation of the index if the variable rate based on that index is subject to a fixed minimum rate or similar requirement that does not permit the variable rate to decrease consistent with reductions in the index."[50] Elsewhere in its rulemaking, the Board stated that granting the variable rate exception to "a card issuer that uses fixed 'floors' to exercise control over operation of the index" would be "clearly inconsistent" with the Act.[51]

Particularly on point, the Board rejected variable rate formulae that use an independent index but allow the index rate to be measured in a manner that favors the bank, such as cherry-picking the maximum rate over time rather than on a designated date, because that prevents consumers "from receiving the benefit of decreases in the index."[52] The Board agreed that a card issuer exercises control over the operation of the index where the variable rate can be calculated based on any index value: "if the terms of the account contain such a provision, the card issuer cannot apply increases in the variable rate to existing balances."[53]

These Board's illustrations confirm that a variable rate formula like Bank of America's—which manipulates an otherwise independent index to the consumers' detriment—"controls the

[49] The court "must interpret the statute as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *In re Pettit Oil Co.*, 917 F.3d 1130, 1134 (9th Cir. 2019).

[50] 75 Fed. Reg. 7658, 7737.

[51] *Id.* at 7658.

[52] *Id.* at 7737.

[53] *Id.*

operation of the index" and therefore does not qualify for the variable rate exception.[54] From the perspective of the Act's language and purpose, and the consumer's pocketbook, using floors or other tactics to delay rate reductions is no different than prematurely implementing rate increases. Both control the operation of the index to harm consumers and are "clearly inconsistent" with the Act.[55]

As explained by the Board, the CARD Act forecloses Bank of America's claim that it can freely manipulate the variable rate formula provided that it *relates* to the Prime Rate. This does not prohibit Bank of America's formula per se, but it means the Bank does not qualify for the variable rate exception and "cannot apply increases in the variable rate to existing balances."[56]

**3. Bank of America's proprietary interest rate formula is based upon billing cycles of its choosing and on that ground it also fails to qualify for the variable rate exception.**

Rather than raising credit card interest rates when the Prime Rate index rate increases, Bank of America imposes interest rate increases on the "first day of your billing cycle."[57] The practice of raising interest rates retroactively and based upon the bank's proprietary method of using billing cycles, rather than raising rates on the dates of the index rate change, also renders its card program ineligible for the CARD Act's variable rate exception.

Under its Cardmember Agreement contract, Bank of America has unfettered discretion to set and adjust the billing cycle for each cardholder. The Agreement defines "billing cycle" as "a time period that ends on a Statement Closing Date (or closing date) *determined by us* and begins on the day after the Closing Date of the previous billing cycle."[58] "Us" is defined as "Bank of America, N.A."[59]

---

[54] *Id.* The Board clarified that "because there is no disadvantage to consumers, . . . card issuers are permitted to set fixed maximum rates or 'ceilings' that do not permit the variable rate to increase consistent with increases in an index." *Id.*

[55] *Id.*

[56] *Id.*

[57] ¶ 40.

[58] Def. Memo., Ex. A at 2, Dkt. 19-1 (emphasis added).

[59] *Id.* at 1.

Bank of America also "reserve[s] the right to amend this Agreement at any time, by adding, deleting, or changing provisions of this Agreement."[60]

In other words, by tying rate increases to billing cycles, Bank of America controls the date upon which it raises rates and the extent to which it retroactively applies a rate increase. This exercised discretion over rate increases is patently inconsistent with the demonstrated intent of the CARD Act and plain language of its variable rate exception, including the requirement that "operation of" the index be beyond the creditor's control and the requirement that any rate increase imposed on cardholders be "according to" that index increase.

**4. Increasing cardholders' interest rates *before* the index increases also *per se* disqualifies Bank of America's program from the variable interest rate exception.**

By imposing a rate increase on cardholders before a Prime Rate index rate increase takes effect—contrary to the requirements of the variable rate exception—Bank of America is plainly not functioning "according to operation of an index that is beyond the control of the creditor."[61] This practice also violates the regulatory requirement that the increase in the rate "is due to an increase in the index."[62] "'[D]ue to' means 'caused by,'"[63] and "it is an inescapable rule of causality that a cause must precede its effect."[64] Indeed, Regulation Z instructs banks to inform customers that if they have a variable rate card, the rate will "*vary with the market* based on the Prime Rate."[65] Raising rates *before* the market increases is not "vary[ing] *with* the market."

The Wall Street Journal specifically states the "effective date" of each Prime Rate increase:

---

[60] *Id.*

[61] 15 U.S.C. § 1666i-1(b)(2)

[62] 12 C.F.R. § 1026.55(b)(2).

[63] *E.g., Padilla v. City of Richmond*, 509 F. Supp. 3d 1168, 1172 (N.D. Cal. 2020).

[64] *Billhofer v. Flamel Techs., SA*, 663 F. Supp. 2d 288, 297 (S.D.N.Y. 2009); *see also Am. Home Prod. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 765 (2d Cir. 1984) ("An effect never precedes its cause.").

[65] CFPB, Regulation Z, Appendix G-17(B), https://www.consumerfinance.gov/rules-policy/regulations/1026/g/#G17-B (emphasis added) (last visited Nov. 21, 2023). This is the language that Bank of America uses in its credit card agreement. Def. Memo., Ex. A at 3, Dkt. 19-1.

WSJ | MARKETS

Subscribe | Sign In

Home World U.S. Politics Economy Business Tech **Markets** Opinion Books & Arts Real Estate Life & Work Style Sports Search

**International Rates** Friday, March 03, 2023

**Prime Rates [U.S. Effective Date: 2/02/23]**

| | LATEST | WK AGO | 52-WEEK HIGH | 52-WEEK LOW |
|---|---|---|---|---|
| U.S. | **7.75** | 7.75 | 7.75 | 3.25 |
| Canada | **6.70** | 6.70 | 6.70 | 2.45 |
| Japan | **1.48** | 1.48 | 1.48 | 1.48 |

**Policy Rates**

Thus, it is Bank of America's policy—not the index—that increases customers' interest rates prematurely.

The requirements explained in Regulation Z establish that a bank cannot apply a rate increase *before* it takes effect:

> *Once an increased rate has gone into effect, the card issuer cannot calculate interest charges based on that increased rate for days prior to the effective date.* Assume that, in the example in paragraph i above, the billing cycles for the account begin on the first day of the month and end on the last day of the month. *If, for example, the card issuer uses the average daily balance computation method, it cannot apply the 18% rate to the average daily balance for the entire June billing cycle because that rate did not become effective until June 15.* However, the card issuer could apply the 15% rate to the average daily balance from June 1 through June 14 and the 18% rate to the average daily balance from June 15 through June 30.[66]

This Official Commentary reflects a general, common-sense principle: a bank does not comply with the variable rate exception if it applies a rate before its effective date. For example, if a Prime Rate increase on June 15 would bring the variable rate to 18%, the card issuer "cannot apply the 18% rate to the average daily balance for the entire June billing cycle because that rate did not become effective until June 15."[67]

Looking closer at how an interest rate works on a particular day illuminates why Bank of America cannot apply a rate increase before its effective date, while claiming to qualify for the

---

[66] CFPB, Comment for 12 C.F.R. § 1026.55(b), https://www.consumerfinance.gov/rules-policy/regulations/1026/interp-55/#55-b-1-Interp-1 (emphasis added) (last visited Nov. 21, 2023).

[67] *Id.*

CARD Act's variable rate exception. Like the bank in the Board's example, Bank of America uses the average daily balance to *impose daily interest charges*. As its Agreement states, "interest accrues daily and compounds daily on new transactions, and balances remaining from previous billing cycles."[68] The problem is that Bank of America regularly imposes daily interest using an inflated Daily Periodic Rate based upon a *future increase* in the Prime Rate rather than the APR in effect on that date.

Plainly, if it otherwise complies with the CARD Act, Bank of America can apply one rate for the first portion of the billing cycle and another rate for the second, after the effective date of the rate increase, which is precisely what is contemplated by numerous regulations. For example, the regulation on periodic statements is directly on point, requiring that "[i]f the annual percentage rate varies (such as when it is tied to a particular index), the creditor must disclose each annual percentage rate in effect during the cycle."[69] In that situation, the statement would disclose "[t]wo or more average daily balances, each applicable to the daily periodic interest rates imposed for the time that those rates were in effect, . . ."[70] Yet despite Bank of America's ability (and requirement) to base each day's interest calculation on the effective daily periodic rate, it chooses to backdate rate increases to impose and compound *daily interest* before the Prime Rate's effective date.

This retroactive application of rate increases is not permitted under the variable rate exception. Moreover, if it were permitted, there would be no limit to the Bank's discretion as to the period of retroactivity. A bank could backdate the rate increase to the beginning of a two- or three-

---

[68] Def. Memo., Ex. A at 5, Dkt. 19-1. And as the CFPB describes, "issuers calculate interest on the account using a daily periodic interest rate. A daily periodic interest rate generally is used to calculate interest by multiplying the rate by the amount owed at the end of each day. This interest amount is then added to the previous day's balance, which means that interest is compounding on a daily basis." *See* CFPB, *What is a "daily periodic rate" on a credit card?*, at https://www.consumerfinance.gov/ask-cfpb/what-is-a-daily-periodic-rate-on-a-credit-card-en-46/ (last visited Nov. 21, 2023).

[69] CFPB, Comment for 12 C.F.R. § 1026.37, Comment 7(b)(4)-1, https://www.consumerfinance.gov/rules-policy/regulations/1026/7/#7-b-4-Interp-1.

[70] CFPB, Comment for 12 C.F.R. § 1026.37, Comment 7(a)(5)-5, https://www.consumerfinance.gov/rules-policy/regulations/1026/7/#7-a-5-Interp-5-ii.

month billing period, or simply adopt a policy to backdate the increase 60, 90, or 120 days before the index increases, while still claiming the variable rate exception. The CARD Act does not permit this discretionary control by Bank of America under the plain language of its exceptions.

**5. Bank of America's arguments in support of qualifying for the CARD Act's narrow exception are unpersuasive.**

First, Bank of America repeats a verbal slight-of-hand by constant reference to a soft correlation between the timing of the increased U.S. Prime Rate and its own retroactive application of interest rate increases—even though the CARD Act permits no such thing. It is "clear," says Bank of America, that its retroactive rate changes were "'due to' changes in the U.S. Prime Rate."[71] Or, as the Bank says repeatedly, its proprietary, retroactive interest rate increases were "tied to" or "due to" changes in the Prime Rate index.[72] That the Prime Rate change was a necessary *precondition* for the Bank's proprietary, retroactive rate increase does not make it the efficient cause of the change—the cardholder rates did not change "*according to*," *i.e.*, in accordance with, changes in the Prime Rate. Critically, Bank of America did not increase and impose its higher interest rates *coterminous with*, or *on the same date* or *at the same time* as, or *pari passu* with the Prime Rate increases in 2022 and 2023. It raised its rates on other dates entirely, dates that it decided—as a proprietary matter—to select.

Bank of America does not dispute this; that is, it does not claim that its rates changed at the same time the Prime Rate changed. But it argues that it is somehow entitled to increase the interest rate on protected card balances retroactively starting *whenever* it chooses to start imposing the increase so long as it triggers this proprietary method *each time* the Prime Rate increases.[73]

---

[71] Def. Memo. at 5.

[72] *See e.g.*, Def. Memo. at 1 ("tied to"), 2 ("are tied to" . . . increases "were tied to"), 4 ("increased . . . with the U.S. Prime Rate"), 5 ("due to"), and 5 n.1 ("tied to"). Bank of America's increased interest rates did not increase "with" the Prime Rate—Bank of America increased its rates at entirely different times and on different days from the Prime Rate changes.

[73] Def. Memo. at 5 ("Plaintiff . . . acknowledges that there have been ten increases in the Prime Rate since March 2022—the same period over which the Plaintiff alleges the Bank increased its variable rate ten times.").

As Bank of America puts it—just because it applies "a rate set as of the last index publication date in a given month to the full billing cycle that overlaps with that publication date *does not divorce the index from the rate* and does not mean the rate is moving *on its own, untethered from the index*."[74] This is a classic straw man argument. The question isn't whether Bank of America's proprietary method bears *any* relation whatsoever to the Prime Rate ("untethered")—the question is whether the increase is imposed on cardholders "according to the operation of an index" that Bank of America does not control. That is what the CARD Act exception requires. Bank of America's chosen method gives it the very control the CARD Act explicitly takes away from card issuers as the price paid for permission to raise interest rates without notice.

In other words, by its very terms, the CARD Act exception doesn't permit card issuers to pick and choose when to increase interest rates; that's how banks exercise the very "control" to arbitrarily raise rates in a manner the CARD Act prohibited. In fact, that behavior triggered the passage of the CARD Act in the first place.[75] What the Act does allow is a narrow exception for increasing a variable interest rate without notice "according to the operation of an index that is not under the control of the creditor."[76] By selecting a date earlier in time—the beginning of a billing period—Bank of America is not operating "according to" the increase in the Prime Rate; to the contrary, it is using a method that is entirely "under the control of the creditor" which is explicitly prohibited.[77]

[74] Def. Memo. at 6 (emphasis added).

[75] S. Rep. No. 111-16, at 5 (2009)

[76] 15 U.S.C. § 1666i-1(b)(2).

[77] No case law supports Bank of America's position. Its references to legal authority universally miss the mark. The court in *Lowman* did not examine the CARD Act at all—having rendered a decision prior to the Act's passage—and its holding is irrelevant. *Lowman v. Citibank (S. Dakota), N.A.*, 2007 WL 5674022 (C.D. Cal. Sept. 19, 2007). So, too, the court in *Search v. Bank of America, N.A.*, 2012 WL 4514285, at * 3 (W.D. Wash. Oct. 2, 2012) (finding the CARD Act provisions irrelevant because enacted subsequent to allegations in the case). The court in *Bello* did not address the question before this Court, but *did* deny defendant's motion to dismiss, finding that plaintiff sufficiently alleged that the bank failed to provide the requisite notice and that the bank bore the burden to establish the application of any exception to the notice requirement. *Bello*, 2020 WL 728804 at *4.

Second, Bank of America claims Plaintiffs have made a "circular" argument.[78] But Plaintiff's argument is quite linear—by implementing a proprietary method entirely of Bank of America's choosing for imposing an interest rate hike on a card borrower *before* an increase in the Prime Rate, it disqualified itself from the narrow CARD Act exception. That logic runs in a straight line from end-to-end. Bank of America argues that it *must* be permitted to raise interest rates retroactively and without notice (including on protected balances) *because* the exception says it can do those things;[79] but of course, if the Bank's practices do not qualify for the exception it can do none of those things. Because of its imposition of a proprietary formula involving a billing cycle it controls, Bank of America disqualified itself from the narrow CARD Act exception.

Therefore, Bank of America's extended argument that Plaintiff is being "nonsensical" because variable rate card issuers can forgo the notice requirement and impose increased rates on some existing balances under the very terms of the CARD Act is irrelevant.[80] Plaintiff challenges Bank of America's *qualification to use* the variable rate exception to the CARD Act at all; so the logic that a qualified program could avail itself of the terms of the exception is simply of no moment here.

Finally, Bank of America fails to acknowledge that the CARD Act does not prevent it from raising rates when the market changes. It just must do so in compliance with the CARD Act's consumer protections. It must provide forty-five-days' notice before any interest rate change and it must protect existing balances from the change. The Bank appears to agree that without qualification, a card issuer must abide those terms—and Defendant did not and does not qualify for the exception and must abide those terms.[81]

---

[78] Def. Memo. at 6.

[79] *Id*. ("Any other conclusion would render the variable-rate exception meaningless."). Yes, but if the Bank doesn't qualify for that exception—and it doesn't—that's beside the point.

[80] *Id*. at 6-7.

[81] *Id*. at 3.

**C. Bank of America's disclosure of its proprietary, retroactive interest rate hike formula is irrelevant—the practice is unlawful.**

Bank of America further defends its practices by arguing that "the operation of the Bank's variable rates" was "disclosed in the applicable Credit Card Agreement."[82] In adopting the FTA Regulations and then CARD Act, the agencies and Congress recognized that disclosure was insufficient to protect consumers from this unfair and injurious practices of increasing rates on existing balances. As a result, they chose instead to prohibit the practice regardless of the notice given or the language of the credit card agreement.[83]

* * * *

In sum, Plaintiff sufficiently pleads "facially plausible" allegations that Bank of America violates TILA by increasing interest rates on cardholders retroactively, without the required notice, and on protected balances, while qualifying for no exception permitting those practices. For this reason, the motion to dismiss Plaintiff's claim under TILA should be denied.

**D. Bank of America's unlawful interest rate practices also violate the California Unfair Competition Law.**

Bank of America acknowledges that the California Unfair Competition Law's "unlawful" prong renders a business practice unlawful under California consumer protection law where the practice also violates another law, here the Truth in Lending Act.[84] Plaintiff advances the inverse of Bank of America's argument that failure to plead a claim under TILA means the UCL claims fails as well; instead, because Plaintiff sufficiently pleads a claim under TILA, so, too, does he sufficiently plead his UCL claim. Accordingly, Bank of America's motion to dismiss the UCL claim should be denied.

---

[82] *Id*. at 4.

[83] The Bank's citation to *Demry* is misplaced. Def. Memo. at 4 (citing *Demry v. Citibank (S. Dakota), N.A.*, 2003 WL 179772 (S.D.N.Y. Jan. 24, 2003)). The summary judgment decision in *Demry* was six years before passage of the CARD Act and involved entirely different provisions of TILA not relevant here.

[84] Def. Memo. at 7 (citing, *e.g.*, *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012)).

## IV. CONCLUSION

In this case, there is a single point of dispute. Bank of America argues that a narrow exception to TILA, a comprehensive consumer protection statute strengthened further by the CARD Act, gives it *carte blanche* to impose retroactive interest rate increases by whatever method it chooses, so long as it can point to an increase in the Prime Rate. But that is contrary to the plain reading of the Act and would render its key protections toothless. If Bank of America's interpretation of the CARD Act were accurate, there would be nothing to stop credit card companies from retroactively imposing increased interest rates on protected balances *going back a three-month billing period, or multiple billing periods*, undermining the very foundation of the CARD Act.

Because Bank of America's construction of the variable rate exception has no limit, it permits the very deceptive and abusive practices that the CARD Act was enacted to prohibit. Bank of America cannot cherry-pick the dates it wants to charge higher interest; if it wants to increase rates, it must abide the forty-five-day notice, protection of existing balances, and other requirements of the CARD Act. And if, instead, it wants the variable rate exception to apply to its practices, it must raise interest rates only "*according to the operation of*" the Prime Rate—that is, at the time of the Prime Rate change, not retroactively and based on its own proprietary design to increase rates at the start of a billing period or any other randomly selected start date that increases Bank of America's profit.

Because Bank of America fails to carry its burden at the pleading stage, Plaintiff should be permitted to litigate his claims under TILA and the California UCL on behalf of himself and the putative class. Plaintiff respectfully requests that Bank of America's motion to dismiss be denied.

DATED: November 21, 2023.

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Shayne Stevenson*

Shayne C. Stevenson (*pro hac vice*)
Breanna Van Engelen (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

shaynes@hbsslaw.com
breannav@hbsslaw.com

Ben M. Harrington (SBN 313877)
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
benh@hbsslaw.com

Knoll D. Lowney (*pro hac vice*)
Claire Tonry (*pro hac vice*)
SMITH & LOWNEY, PLLC
2317 E. John Street
Seattle, Washington 98112
Telephone: (206) 860-2883
Facsimile: (206) 860-4187
knoll@smithandlowney.com
claire@smithandlowney.com

*Attorneys for Plaintiff*