**Pages 1 - 28**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín

```
AUSTIN MILLIKEN,                )
                                )
          Plaintiff,            )
                                )
  VS.                           )   NO. C 23-03709-AMO
                                )
BANK OF AMERICA N.A.,           )
                                )
          Defendant.            )
                                )
```

San Francisco, California
Thursday, February 22, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
        SMITH AND LOWNEY, PLLC
        2317 East John Street
        Seattle, Washington 98112
      **BY:  CLAIRE TONRY, ATTORNEY AT LAW**

For Defendant:
        O'MELVENY & MYERS LLP
        610 Newport Center Drive
        17th Floor
        Newport Beach, California 92660
      **BY:  DANIELLE O. MORRIS, ATTORNEY AT LAW**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
          Official Reporter, CSR No. 12219

<u>Thursday - February 22, 2024</u>                    <u>1:59 p.m.</u>

P R O C E E D I N G S

---o0o---

THE CLERK:  All rise.

This Court is now in session.

The Honorable Araceli Martínez-Olguín presiding.

THE COURT:  You may be seated.

THE CLERK:  Calling Civil Matter 23-3709, Milliken v. Bank of America.

Counsel, please come up to the podiums to state your appearances for the record, starting with the plaintiff.

MS. TONRY:  Good afternoon.  Claire Tonry with Smith & Lowney on behalf of the plaintiff.

MS. MORRIS:  Good afternoon, Your Honor.  Danielle Morris with O'Melveny & Myers on behalf of Bank of America.

THE COURT:  Good afternoon, Counsel.

Go ahead and come forward, both of you, because often -- we're here on defendant's motion to dismiss, so I'll go ahead and let defendants start.  Though, I will flag, just at the outset, that the bulk of my questions -- I have a handful of questions for you, Ms. Morris, but the bulk of my questions -- I'm so sorry, Ms.?

MS. TONRY:  Tonry.

THE COURT:  Tonry, thank you.  I'm like -- so the bulk of my questions are for you, Ms. Tonry.

But -- so Ms. Morris, so you don't feel neglected, I'm happy to let you start and I'll pepper you with the handful of questions that I've got, so we'll have you go first and then I'll turn to you, Ms. Tonry.

Okay.  Go ahead.

**MS. MORRIS:**  Thank you, Your Honor.

Your Honor, there's a single legal question that must be decided to determine whether plaintiff's claims must be dismissed with prejudice or if they can proceed past the pleading stage.  The question is whether the variable rate exception to the CARD Act permits a credit card issuer to apply interest rate changes to the card's balance as of the first day of the billing cycle in which the Federal Reserve adjusted the index to which the interest rate is tied.

The answer to that question has to be yes.

We have to look no further than the CARD Act itself to answer this basic question because if the answer were no, there will be no variable rate exception in the act.

A little context might be helpful.  I'll keep it brief; I realize you have read the papers Your Honor.  Thank you.

A committee of the Federal Reserve Board sets interest rates.  That's the U.S. prime rate.  That committee meets approximately 10 times a year -- give or take -- not on a set day of the month; they meet when they meet.  We all sit around watching MSNBC to see whether we think they'll raise interest

rates, lower interest rates, or stay the same.  Lenders and credit card issuers adjust their interest rates based on the U.S. prime rate, as is applicable here.  There are other indices.  Those are not at issue here.

And the way that lenders and card issuers assess interest is they take the index plus a margin, whether it's a fixed rate product or a variable rate product.  Interest rates on loans and financial products are set at the index plus a margin. With a variable rate product, that interest rate can change over the time based on the fluctuation of the index.  The margin, as is applicable here, stays the same.

The interest rate goes up or down depending on the movement of the index and, as is applied here, the same process for determining the interest rate applies regardless of whether the Fed has raised rates that meeting or if they've lowered rates that meeting.

If we look at what happened in the limitations period of this claim here -- from August of 2019 to the present, from August of 2019 until the onset of the pandemic, the Fed was lowering interest rates.  For the next two years of the pandemic, rates stayed low; the Fed did not move them.

In March of 2022, to quell -- the word everyone is talking about that's escaping me -- to quell inflation, the rates began to rise.  When the Fed meets next, will they raise rates again or not based on the fact that inflation is cooling?  We don't

know.  Time will tell that.

But here, what's not at issue is any change in the margin. That's not alleged; it didn't happen.  There's not -- it's not at issue whether there was any change in methodology about how the interest rate would be calculated.  That did not change; it's set forth in the credit card agreement.  Hasn't changed. It's the index plus the margin.

There has not been a change in the methodology.  There has not been any change in how interest rates have been calculated for credit card holders.  There's not been a change in the index that was used.

So what is alleged here is simply a challenge to the practice of applying the change to an interest rate for the entire billing period during which the Fed changed the rate, whether it's up or down.

So the market committee of the Federal Reserve Board meets on the 13th, they raise rates.  Does the variable rate exception to the CARD Act allow the balance for that entire billing period -- it might start on the 1st of the month; it might not -- for the entire billing period to be calculated at the new rate?  The answer has to be yes.

The CARD Act, and specifically the variable rate exception, expressly permits exactly this practice.  There are two provisions of the CARD Act that are relevant here.  The first is at 15 U.S.C. 1666i-1.  That's what prohibits creditors

from increasing interest rates applied to outstanding balances. That's the general rule.

The second provision is at 15 U.S.C. 1637i-1.  That requires 45 days notice in advance before a creditor can increase an interest rate.

Both of those provisions are expressly subject to the statutory exception that is called the variable rate exception, and that's what's at issue here.  If that exception allows a credit card issuer to calculate the interest due for the entire billing cycle in which the rate changes, then plaintiff's claims have to be dismissed.

The variable rate exception itself is found in 15 U.S.C. 1666i-1(b).  It says that (as read):

"The previously mentioned prescriptions do not apply to credit cards with variable interest rates as long as the interest rate changes," quote, "according to operation of an index that is not under control of the creditor and is available to the general public," end quote, "as long as the credit card agreement explains that that's what's going to happen."

The index at issue here is the publicly available U.S. prime rate, set by the Federal Reserve.

And the credit card agreement, which is in the record -- and specifically on page 6 of Docket Number 19-1 -- the credit card agreement explains (as read):

"Bank of America will calculate variable rates for its cards using the U.S. prime index plus a margin" -- and that it will look at the prime rate that's published on the last day of the month.

Because, again, there's no uniformity in when the committee meets and when rate changes may go into effect.

The new rate applies -- the contract says the new rate will apply for the entire billing cycle in which the rate changes.

That's what the plaintiff alleges happened here.  That's what is described in the contract.  It's true regardless of whether the Fed increases or decreases interest rates.  And that's what plaintiff alleges happened to him; that's what will continue to happen over time, if he keeps his card, regardless of whether rates increase or decrease.

So the issue whether the practice of using the prime rate as of the last day of the month to calculate interest for the billing cycle in which the rate changed means that -- the plaintiff says that that means that the rate is not changing according to operation of an index.  That's the entire issue on which this motion rises and falls.

If applying a changed interest rate to the entire billing cycle in which the Fed changed the rate meant that the variable rate exception did not apply, there would be no purpose to the variable rate exception.  The only thing the variable rate

exception does is exclude variable rate cards from the proscription on retroactive application of rate changes and from the requirement for advance notice of rate changes.

There is simply no way to reconcile plaintiff's position with the existence of the variable rate exception. The statute says if you meet statutory criteria you can retroactively apply rate changes. Plaintiff says if you retroactively apply interest rate changes, you can't meet the statutory criteria. Those two positions can't be reconciled.

And that's all that the plaintiff challenges here, but it's exactly what Congress expressly permits card issuers to do by having drafted the exception that they drafted.

**THE COURT:** Let me ask you, Ms. Morris -- so in your papers, you cite me *Demry*, and I'm curious if -- could you please tell me why it's applicable if it was decided before the CARD Act was passed?

**MS. MORRIS:** Cases before the CARD Act were passed could still be informative because the CARD Act served a purpose; right?

President Obama passed this legislation because there were certain acts that were prevalent in the credit card industry that -- that Congress and the executive administration at the time desired to eliminate. Certain retroactive applications of interest rate raises were certainly among those, most definitely.

And the case law that predates the CARD Act is illustrative for a number of reasons -- I think the most important of which is the fact that it shows what practices were prevalent, what Congress and the drafters of the CARD Act knew to be going on, and what they intentionally drafted the CARD Act to proscribe on the one hand and to permit on the other.

**THE COURT:**  That is the one question I have for you so far.  If you want to take another moment to wrap up and then I'll turn to Ms. Tonry.

**MS. MORRIS:**  That's all I have for now.  I'm happy to answer any further questions or respond, of course, to anything plaintiff says.

**THE COURT:**  Ms. Tonry, the floor is yours.

**MS. TONRY:**  Thank you, Your Honor, and may it please the Court.

I agree that the question before this Court is a straightforward one, but I would phrase it thusly -- and this is a question of statutory and regulatory interpretation.

The issue is:  Is increasing interest rates days or even weeks before the index rate increases -- is that acting according to the operation of an index over which the creditor has no control?

And:  Is an interest rate increase that occurs before the index increases, can that be said to be due to an increase in

the index?

The answer to both questions is no.

Bank of America's practice of backdating rate increases to the beginning of billing periods -- which, it's critical to acknowledge, are periods that are established by the bank itself in its discretion and are solely controlled by the bank -- that does not satisfy the CARD Act's variable rate exception, and therefore the bank's increases are illegal.

And before I respond to Bank of America's key argument, I want to note at the outset that the CARD Act is a remedial statute and its exceptions are therefore construed narrowly in favor of consumers, and the bank has the burden to show that it qualifies for an exception.

Bank of America cannot meet that burden.  The bank cannot point to any specific text or any case law that supports its reading.

We, on the other hand, have multiple lines of authority showing that the phrases "according to the operation of" and "due to" mean that banks cannot increase rate before the index rate itself increases.

Specifically, we have case law showing that the phrase "according to the operation of" means solely determined by that index and no other variable.

Case law is also crystal clear, the obvious proposition, that the phrase in the regulation like "due to" signifies

causation.  And so, of course, the cause must precede the effect.  So in other words, the index increase must precede the bank's increase to meet the variable rate exception.

I just want to back up a step because, fundamentally, an index -- it's not just a percentage rate.  An index has two components.  It has the rate component -- the percentage rate component, and it has a temporal component.  So when the Wall Street Journal, for example, publishes the index, it gives an effective date of the rate.  So it's a rate schedule, in other words; it has these two components.

But Bank of America's practice disregards the temporal component of the index.  The bank makes proprietary decisions about when the rate will increase rather than acting according to the index's effective date.  So this also violates the requirement that rates vary according to the operation of an index over which the bank has no control.

The limitation on control precludes Bank of America from applying interest rate increases prematurely based upon its own billing cycles which, again, are controlled exclusively by the bank and the bank may change them at any time.

**THE COURT:**  Ms. Tonry, do you have any allegations that Bank of America changed the billing cycles for your client?  Because I didn't see those, so I just want to make sure I didn't miss them.

Because I do grasp that part of your argument has to -- or

maybe a large part of your argument has to do with how the billing cycles work, but I didn't see anything that indicates or that -- where you allege that Bank of America has moved them in any way.

**MS. TONRY:**  We do not allege that the bank has changed our client's billing cycles, per se; but the point more goes to the statutory interpretation which is if we take Bank of America's logic to its full extent, and acknowledging that the bank has discretion over billing cycles, there's nothing in Bank of America's interpretation of the rules to prevent the bank from, say, increasing billing cycles to 90 days and applying rates retroactively for 89 days.

**THE COURT:**  But your client doesn't have standing to challenge what Bank of America could theoretically do.  Your client only has standing to challenge what Bank of America has done to them.

**MS. TONRY:**  That's absolutely right.  And what Bank of America has done to my client is illegal, and the examples that I'm giving just more point to the statutory interpretation piece.  And, you know, can we take Bank of America's logic to its full extent?  It does not hold up under the CARD Act's specific language, nor does it stand up to the regulatory language.

**THE COURT:**  Can we actually focus on the regulatory language, because the CFPB's guidance, to my mind -- and

I'll -- let me see if I can find exactly what I'm looking at right there.

So 12 CFR 1026.55(b)(2); right? So I read -- I read that to say that -- right? -- the variable rate can be calculated based on an index value during a period of time, including an average index value during a specified period or the index value on a specific day.

I read that, and it looks like exactly what Bank of America is doing. So help me understand how they are doing something different than what the CFPB has said is how the CARD Act is to be interpreted.

**MS. TONRY:** Yes, certainly.

So first of all, I just want to make the point that the -- there's a difference between, you know, the official commentary and the regulatory language itself, which, of course, is our main source of the applicable law.

And the regulation says that the increase needs to be due to an increase in the rate. And so that's where we get to this point that the retroactive application to balances incurred before the Fed even increased the rate is not -- cannot be due to because it cannot be caused by.

But to speak to the commentary -- and we have gone thoroughly through all of the commentary that exists, all the commentary that the bank has cited. It's all consistent with our interpretation and none of it supports the bank's

interpretation.

The examples that are given in the commentary that actually pertains to 55(b)(2), that's directly on point, that gives examples such as using the average index value during the prior quarter or the last day of the prior quarter.

So all of these examples that the CFPB provided, none of them anticipate that there would be a retroactive application to before the index increase.  They all contemplate going forward, just picking the date from a prior time period, and applying that going forward.

**THE COURT:**  Is there not also -- is the bank not allowed to also pick an index value from a specific day?

**MS. TONRY:**  They absolutely can pick a specific day. It's when they apply it that creates the problem.

So, you know, I think that I do want to address Bank of America's argument and -- because I think that it is a little bit confusing.

I think Bank of America is really relying on this generic argument that the purpose of the variable rate exception is to allow, quote/unquote, retroactive rate increases.  But that word, "retroactive," does not appear anywhere in the statute or the regulation.  And I think Bank of America is really attempting a sleight of hand here, and that doesn't change what the law says.

Because they -- I think they're confusing the issues here.

I do want to break it down and use a little bit of an old-fashioned graphic, if I may.

THE COURT:  I got them.  I have two copies.

MS. TONRY:  Probably excessive, but I want to be able to gesture.  So --

THE COURT:  You're fine.  I feel like we had an easel, but maybe not.  Go ahead.

MS. TONRY:  When the variable rate exception applies, it allows the bank to increase the interest rates on this preexisting balance.  So it does have that application to something that was in the past, it's the existing balance, but they can only apply it, the increase, going forward to that existing balance.

So this has a purpose and it effectuates the purpose of the act, which is to prevent the banks from losing money when the treasury rate increases and -- so therefore, this does accomplish -- this does not defeat the purpose of the CARD Act whatsoever; they're allowed to increase the rate going forward on the existing balance.

But what Bank of America is doing is that they're raising the rates before the Fed even increases the rate.  And that's not necessary to effectuate the CARD Act exemption.  Instead, what they're doing is they're profiteering, and they're profiteering in a manner that Congress outlawed when it drafted the narrow exception, the narrow variable rate

exception that constrains interest rate increases to vary according to the operation of the index.

So, again, the bank could -- there would be no end to this if this was the way that the statute read.

**THE COURT:**  I need you to -- I'm just going to gesture you gently away from sort of a slippery slope argument because, in the end, what I have -- the only thing I can deal with is allegations about what's happened to your client.

So let me -- I appreciate the demonstratives, but let me talk you through a hypothetical, because I just want to make sure -- this is my -- tell me if I'm understanding your description of this.

So -- and I will, of course, also give you, Ms. Morris, a chance to respond to my hypothetical.

But here's -- this is -- I'm trying to make sure that I'm following, ultimately.

So, let's say the prime rate remains stagnant at 3 percent for nearly a whole month and then, on the last day of the month, it spikes to 4 percent before dropping back down to 3 percent for the entirety of the next month.

All right.  So if we assume the billing cycle runs from the -- and actually, this may be -- tell me if this is what you have, but is the billing cycle running from the 15th to the 14th?

**MS. TONRY:**  It certainly could be.

**THE COURT:** All right. Let's do that.

My point was to try and put it -- right? -- behind or in front of the last day of the month; right?

So if the billing cycle is running from the 15th to the 14th every month, when the plaintiff gets the bill for that month, his variable rate exception rate is based on the 4 percent prime rate published on last day of the month. And you contend that that 4 percent is improperly applied retroactively to the balance between the 15th and the 31st.

Is that -- am I -- have I followed -- I'm trying to just make sure that I am following your argument. Does that --

**MS. TONRY:** I believe, that that is true. I have another graphic for this specific purpose because I think that it --

**THE COURT:** Yes.

**MS. TONRY:** And I think it is also important to note that Bank of America -- the interest accrues daily and the interest is charged daily; there's a daily calculation. So they're applying this backward to days before the rate increase happened.

And so here we can see what the CARD Act permits. And so this assumes that the interest rate -- that the billing period, you know, just runs straight from the 1st to the 30th, for simplicity. The index rate increases toward the end of the month. This is what's allowed.

This is what Bank of America is doing instead.  The index rate hike happens toward the end of the billing cycle, and yet it's applied to every day preceding in the billing cycle.

THE COURT:  Can I check one other thing?

Is it your contention that this is different somehow from what is in the cardholder agreement?  Or is your contention actually just that what is in the cardholder agreement is what's unlawful?

MS. TONRY:  The latter.

THE COURT:  Okay.

MS. TONRY:  Right.  And so Bank of America doesn't gain anything by pointing to that agreement because the policy is what's illegal.  And so because they do not qualify for that exception, all of the interest rate increase is illegal because they have to qualify for the exception.

THE COURT:  And your point is -- I have in my notes according to, but I don't think that's actually -- you argue that they don't qualify for the exception -- finish that sentence for me -- because?

MS. TONRY:  Because the exception requires that the bank -- well, first of all, because it's interpreted narrowly, and the exception requires that the increase vary according to the operation of an index -- which it doesn't -- and the regulation requires that the increase in the rate be due to the increase in the index -- which, again, is impossible because

it's happening -- Bank of America is applying it before, every day before it even happened.

THE COURT:  So this is the part that I've been having a hard time wrapping my head around:  Assume that Bank of America wants to continue using the prime rate from the last day of the month before.  What does the billing cycle have to be for that to still be an acceptable date under your interpretation of the CARD Act?

MS. TONRY:  The billing cycles don't need to change. The billing cycles can be whatever the bank wants.  The bank just needs to only apply it to -- again, they're calculating on a daily basis so they can have any cycle, as long as they're just applying the increase to those days after the Fed increases the rate.

THE COURT:  But this is my question.  So I'm -- if the billing cycle doesn't change, I understand you to be saying that the interest rate charged would remain the same from -- all right.  Right.

If the billing cycle is from the 15th through the 14th, if the interest rate goes up and -- right? -- if prime goes up and so the interest rate goes up at the end of the month, Bank of America could apply that higher rate in the -- for the next bit -- for the next month until whatever prime does at the end of the following month; is that correct?

MS. TONRY:  Yeah.  I think that's exactly what we are

trying to depict here, is that, you know, mid-billing cycle the index rate increases they could apply that to the daily balance going forward.  I hope that answers the question.

THE COURT:  It does.

MS. TONRY:  I appreciate --

THE COURT:  How's this?  I'm trying to make sure I understand your contentions; right?  This is my, "Please, just help me wrap my head around it."

I've got one more question for you -- or I've got a couple more questions for you.

If I'm -- if I'm -- if I grant the motion to dismiss because I disagree with the way you read the CARD Act, is there anything that your -- that you-all can add in terms of factual allegations with regard to your claim to bolster it?

MS. TONRY:  Certainly, if Your Honor is concerned about, you know, billing cycles that may be different from my client's, those could absolutely be added with additional clients.  But I don't think that that's necessary because I think that it's just a statutory interpretation question.

THE COURT:  Thank you.

And -- I guess, to that end, to the extent that I hear you agreeing that that's a legal question, I had a subsequent question about whether -- whether this case was ripe for judgment on the pleadings, or whether discovery of any sort would be needed.  And I think, by virtue of your answer to the

previous question, my best understanding of that is there isn't anything that discovery is going to get you.

**MS. TONRY:** No. I think that this is, again, a regulatory and statutory interpretation question.

**THE COURT:** Okay. Those are my questions, but I'm happy to give you another few minutes if you'd like them.

**MS. TONRY:** Just very quickly. I only need a few minutes.

But I just want to say that this is an unprecedented increase in interest rates that consumers are facing. They are being hit hard by this. For a bank to, in our view, abuse the situation and charge far more interest than it could if it was actually varying with the market -- which is what the regulations require, which is what the statute requires -- is a very harmful violation of the CARD Act, and so we do ask that the Court deny the motion and allow us to proceed so we can stop Bank of America's abusive practices.

**THE COURT:** Thank you.

**MS. TONRY:** Thank you.

**THE COURT:** Ms. Morris?

**MS. MORRIS:** Your Honor, if I could just respond to your hypothetical and make a couple more brief points.

Regarding your hypothetical about a situation in which the billing cycle runs from the 15th to the 14th, the rate is at 3 percent in the first part of that billing cycle, and on the

last day of the month changes to 4 percent.  And then, let's assume that the committee meets the following month.  As of the last day of the next month, it's back up to 4 percent.  In that scenario, for that entire billing cycle, that customer would have been charged 3 percent because the rate changed -- if the rate as of -- let's say we're talking about March 15th to the 14th, if the rate changed on the 31st of March, that is the rate that will have applied to that entire billing cycle.

If it doesn't change -- if it changes, again, in April and goes back up, that would apply to the April 15th to May 14th billing cycle.  But for the March 15th to April 14th billing cycle, because as of March 31st the rate was 3 percent, that entire billing cycle will accrue interest at 3 percent.  The following would go up to 4 percent.

So just to clarify that factually -- I don't think there's a dispute about that at all.  That's what the contract provides and that's what's alleged in the complaint.

There are two -- I think, the plaintiff's main argument is a textual one based on two phrases.  One is that the rate has to vary according to the operation of the index and the other is the use of the language "due to an index."

And plaintiff argues that there is a causation requirement there and that one must precede the other.  Our position is that one does precede the other.  Bank of America does not decide to raise or lower -- again, remember this works in both

directions.  Before consumers were paying more interest on their variable rate cards, they were paying less interest on variable rate cards.  They may very well go back to that.

But the decision by the Fed to raise or lower rates is what prompts Bank of America to then use that rate to calculate interest that is accrued during that billing cycle.  They don't decide in advance "We think the Fed is going to raise rates, let's go ahead and start assessing this interest here."

Let's use your March 15th to April 14th billing cycle example.  If someone is carrying a balance on their card, it's accruing interest and they want to pay off some random -- you know, they've got a tax refund or something; they want to use that to pay off their card.  They're going to pay off their card and it will have assessed interest at the rate at that time.  And then, when the -- if the rate changes and Bank of America is calculating the interest that applies during that billing cycle, that determination is not made until the Fed changes the rate.

And then, I would even say it's not necessarily retroactive application.  It is using the Fed's current rate to calculate the interest that comes due in that same billing cycle.

On the point about billing cycles, plaintiff's billing cycle was a month long.  I'm not aware of there being any other length of billing cycle.

And one additional point, to the extent that there's a concern about abusing, you know, the start date and end date of a billing cycle -- which hasn't been alleged here -- credit card customers at Bank of America can choose their own billing cycles.  So that's a nonissue.

It sounds as if plaintiff doesn't want to amend or make any steps in that direction.  It wouldn't be fruitful.  It's not something that happens.

On the last point that plaintiff made about increasing interest rates being harmful to consumers, this practice applies the exact same way in a rising interest rate environment and a decreasing interest rate environment.

For the first three years of these limitations period of this case, rates were decreasing or holding steady.  There has been no abuse alleged by Bank of America in terms of manipulating the system or changing how it does anything to profiteer -- as plaintiff says -- or otherwise take advantage of consumers based on the interest rate scenario that we're in.

Thank you, Your Honor.

**THE COURT:**  Thank you.

Ms. Tonry, if you want to take a moment to respond, you can have it.

**MS. TONRY:**  Thank you, Your Honor.

I just want to respond to two points.  The first is that, as a factual matter, there's no contesting that the bank

actually applies the interest rate increase before.  It picks the date toward the end of the billing cycle; toward the end of the month, it applies it.  It actually does charge those increases.  So to say that it's, you know, somehow later in time when consumers are actually paying the price based upon a daily calculation, I think, is a little inaccurate.

And then I also want to make the point that, yes, it's true that currently, as the cardholder agreement is written, it could be more favorable to consumers if rates were to decrease. But that ignores the fact that the bank can choose a different date if they -- if we enter a decreasing interest rate environment, nothing stops the bank from picking a different date from which to base its increases or its decreases.

So there is lots of discretion because Bank of America chooses the billing cycles, it slots customers into the billing cycles, and it can change the method.

THE COURT:  Let me bring you back to your first point because you're saying that can't be a factual dispute, and yet somehow I feel like that's the point.  You-all should be able to agree on that and I don't hear you agreeing.

I hear you both saying that the other one is going to agree, but I don't hear it.  So let's try this one more time with what has actually happened to the plaintiff here.

So what is your client's billing cycle?

MS. TONRY:  It's approximately mid-month to mid-month.

**THE COURT:** All right. So let's -- maybe that's why my hypo had 14th -- or 15th to 14th.

So the example that Ms. Morris gave me -- right? -- we did -- you gave me March.

I'm not going to be able to repeat it. Could you actually give it to me again?

**MS. MORRIS:** Sure.

**THE COURT:** So that I just -- this feels like one thing we should be able to -- I want to make sure -- I feel like you all should be able to agree on this before -- before we wrap up.

So, Ms. Morris, could you give me that example again?

And then, Ms. Tonry, I'm going to ask you to tell me where you disagree.

That's all. If you -- you don't have to agree by the time we wrap. I just want to make sure I understand where the disagreement is, if nothing else.

So, Ms. Morris, if you would, please.

**MS. MORRIS:** So, in March, the U.S. prime rate is 3 percent. The billing cycle begins March 15th, runs through April 14th. On March 31st -- let's say that's the last day that the Wall Street Journal publishes the U.S. prime rate -- it is 3 percent. For the entirety of that billing cycle, which ends on April 14th, plaintiff would be charged 3 percent, plus the margin.

In April, I'm --

THE COURT:  Hold that thought.

MS. TONRY:  Yes.

THE COURT:  What do you say so far?

MS. TONRY:  We don't dispute that.  We're talking about a situation where the interest rate increases, so that's just the --

THE COURT:  Okay.  This is what -- again, I just -- I want to make sure that as we go I know where it goes.

Go ahead, Ms. Morris.  So April.

MS. MORRIS:  April, the billing cycle has ended on April 14th.  The committee meets, raises the rate to 4 percent.  On April 30th, the Wall Street Journal publishes that 4 percent.  That 4 percent rate will apply to the balance on the card from April 15th to May 14th and --

THE COURT:  And if I understand -- so if I've got this, Ms. Tonry, your issue is with the fact that 4 percent applies from April 14th to April 30th.

MS. TONRY:  Exactly.

THE COURT:  Thank you very much.  Sorry.

Thank you.  I now feel much more educated about your dispute.

Anything else from either of you?

MS. MORRIS:  No, Your Honor.  Thank you very much.

MS. TONRY:  No, Your Honor.

**THE COURT:**  Okay.  Thank you both.

I'll take it under submission.  Thank you so much.

And we're adjourned.  Thank you.

(Proceedings adjourned at 2:35 p.m.)

---oOo---


### CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    Monday, August 26, 2024


_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court